**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No.    22-cr-282-3 (TSC)** |
| **ELIAS IRIZARRY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Elias Irizarry hereby submits the following memorandum in aid of sentencing in this matter.  Mr. Irizarry respectfully requests that this Honorable Court sentence him to a period of probation and community service.

**Introduction**

Elias Irizarry was surely one of the youngest individuals at the U.S. Capitol building on January 6th, just two months past his 19th birthday.  Counsel has now represented many individuals involved in the January 6th riots and talking to Elias is just different.  First, Elias put little to no thought before entering the Capitol.  He is not and has never been an "election denier," he was skeptical of some right wing talking points and entirely dismissive of their conspiracy theories.  Second, Elias is a bright young man who had the brightest future before him before January 6th.  Third, Elias's regret and remorse stands out.  He does not think of his conduct as a "stupid mistake" but as a source of great shame and a sign of disloyalty to his country, his family and his name.  Because of these factors, Elias will not only be paying his debt to society while under supervision – he will regret his actions for the

rest of his life.  But Elias is the special individual that will nevertheless thrive and he will use this experience to become more loyal and more devoted to serving this country.

As the Court looks through Elias' sentencing materials, one thing will become abundantly clear.  Elias was an exceptionally good son and an all-around good kid. His mother, his siblings, his teachers, his friends' parents, his grades, his many mentors, his extra-curricular activities all show that he was some version of "reserved, focused and has always been quite responsible."  Ex. 5.  He is a model young man in many ways – he "has shown considerable initiative in civil service," is a "top student," and is "well-liked by [both] faculty and by his fellow cadets."  He was seen as a "positive influence."  Perhaps because he was bullied in his youth, perhaps because he played on a special needs baseball team, he developed a strong sense of empathy.  He has accumulated nearly 600 hours of community service in the past five years and that does not include the volunteer work that he will soon begin, having completed his training for FEMA.  Elias also spent middle school and high school learning about politics.  Not the "politics" spewed by Infowars and the MyPillow guy but international relations through the Model United Nations and Boys State.  And as many adolescents do, he zigzagged between political views – he may be the only person from January 6th who attended Black Lives Matter protests as a participant and not to hunt down the ghost of Antifa.

So how do we get from one place to another?  How does a high achieving student who shows empathy to strangers and loved ones, with such a bright future

turn into a posterboy for teenaged insurrectionists?  Can it be that a person who stood side-by-side with people who believed in Q is actually not only an successful student but also "gentle and compassionate in nature" and a young man "who lends empathy and respect to all"?  Exhibit 3.  Fortunately, there is a long record of people who know who Elias really is.  Fortunately, he has spent most of his life serving others and working to serve the country through the armed forces. Exhibit 12 and 13.  The record is clear.  Yes, most of the January 6th cases involved individuals who were angry about the election and were looking for an outlet for the rage fomented by the president.  But Elias wanted none of that.  For him, the whole day was about going with the flow – a series of unfortunate and unrelated occurrences - until the exceptionally poor decision to enter the Capitol building.

Unlike so many individuals in Washington D.C. on January 6th, Elias was not particularly interested in the rally.  It was the first break of his freshman year in college – the first weeks that he had been home since the summer and the first reunion with his friends from high school.  To make matters worse, he had recently been dumped by his first girlfriend and wanted a mental distraction.  On top of that, his closest friend Eliot Bishai was going to head to boot camp soon.  But when Eliot asked Elias to join him in D.C. for the rally, Elias said no – his mother had made plans for the two to take a road trip to spend some time together.

Elias and his mother are very close, as they experienced significant hardship when he was young.  As Ms. Irizarry reports, Elias' father left the family in his formative years and he headed to the West Coast.  When that happened, the family

struggled but was able to get by.  But when Elias went to high school, his mother fell ill and was out of work for nearly a year.  For that year, the family essentially surfed couches, relying upon the good will of others and food stamps to survive. When they exhausted their options in New Jersey, they moved to South Carolina and fortunately, his mother started recovering.  Her work situation steadied and the results showed with Elias.  Elias did well in high school. He studied, continued his volunteer activities and joined the Junior ROTC.  With stability, Elias thrived and prayers were answered when he was admitted to the Citadel

But Elias' mother fell ill in the days leading up to January 6th and she had to cancel their planned trip – occurrence No. 1.  Elias planned to stay with her but Elliot's mother, Kim Bishai, suggested that Elias join her, assuring both Elias and Ms. Irizarry that she and her church group would be going to the rally, have a picnic then return on the bus.  It was presented as almost a family affair, even school aged church kids joined.  So despite a lukewarm desire to go (on the part of Elias) and discomfort for going (on the part of Mrs. Irizarry), they decided that Elias would go, at least so he could spend some quality time with his friend.

Sometime in the next 24 hours, Grayson Sherrill, known to Elias online from gaming, reached out and asked for a ride, with an offer to pay for gas – occurrence No. 2.  Elias and Elliot agreed, deciding to make a trip to D.C. out of it – they would go the previous night and have good food and see some sights and they would meet up with the church group in the morning. None of the teenagers wanted to wake up at 4 am to go with the church anyway.

Elias does not make excuses for his choies but it is true that he entered the building only because they became separated from Grayson and his phone had died – occurrence No. 3. The three had arrived together and when Grayson was nowhere to be found, Elias entered the building to find him. He entered through a window and in hindsight, the criminality of his actions were so obvious. But in the moment, it seemed so easy to justify his actions and he succumbed, entering the building.

It should be noted that Elias did not shout or yell any chants either outside or inside the building. And at the moment he began to process just what he had been apart of, he immediately regretted it. His mother recalls a tearful conversation where Elias realized what it was that he had joined and the shame he felt for what he had done.

Since January 6th, Elias has done everything that he can do to make amends for his misdeeds. He expressed a desire to plead guilty early on in the case, but he received the same advice as all of undersigned counsel's clients – to wait to see how these cases played out. The strategy was consistent with Elias' desire to complete as many credits as possible because Elias also knew that once he pleaded guilty, he could potentially be expelled from the Citadel. And sure enough, after he pleaded guilty, Elias was promptly summoned to the Commandant's Board. He was expelled and could not reapply for a minimum of one year.

What is most impressive about Elias is his sincerity in making amends. Of course he wishes to present to the Court his best self – but his true goal is to restore his own good name, his reputation and the reputation of the country. He recognizes

that the harm created by the mob of people who descended on the Capitol went well beyond our borders. He texted counsel when Brazilians stormed government buildings several months ago – worried that what he did had somehow inspired what they did. Befitting a young man of his age, he worries that he was responsible for undermining the progress of democracy in the world. In other words, unlike most defendants, he maximizes his role in January 6th.

To being the endless task of making amends, he has completed training to be a volunteer firefighter and will soon be deployed. He works in an internship for his local government and his mother reports that he donated his first paycheck to the memorial. He volunteered after the recent hurricane working around the clock and even sleeping on site. He volunteered at a Veterans Hospital. And he will soon be deployed by the National Wildlife Coordinating Group, a division of FEMA, as a Type 2 IA firefighter to susceptible areas out west.[1] Regardless of the Court's punishment in this case, Elias is determined to earn back the hard-fought

---

[1] According to the NWCG website, Elias' duties will include:
- Establish and maintain the physical fitness level necessary to effectively perform hard physical labor for extended periods under adverse climate, fuel, and terrain conditions.
- Perform wildland fire and prescribed fire duties including suppression, preparation, ignition, monitoring, holding, and mop-up. Use standard firefighting tools such as pulaskis, shovels, McLeods, chainsaws, drip torches, and fusees to do this work.
- Perform hand crew duties including packing heavy loads of fuel, food, water, and tools for miles over rough terrain in hot and smoky conditions to get to the work site.
- Perform engine operations duties including running the pump, deploying hoselays, completing preventative engine maintenance checks, and effectively using water and additives.
- Perform portable pump operator duties such as pump site selection, set up, and operation.
- Support chainsaw operations.
- Apply knowledge of fuels, terrain, weather, and fire behavior to decisions and actions.
- Use Incident Command System (ICS) terminology, organization, and command structure.
- Use and maintain personal protection equipment (PPE).
- Follow crew standard operating procedures (SOPs).
- Ensure proper refurbishing and resupply of tools, vehicles, food, water and supplies.

https://www.nwcg.gov/positions/fft2/position-ipd.

reputation that he so suddenly lost and to help the country earn back its long-held international reputation that was so painfully lost over just a four year term.

## **BACKGROUND**

On October 26, 2022, Elias Irizarry pleaded guilty to Entering in Remaining in a Restricted Building, in violation of 18 U.S.C. §1752(a)(1). The defense agrees with U.S. Probation's assessment that "Mr. Irizarry's culpability appears to be minimal in contrast with individuals who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date." ECF 109 at 1. Based on all of the factors discussed below, Mr. Irizarry respectfully requests that the Court impose a sentence of probation and that he complete community service so that he may soon return to his education.

Elias Irizarry and his two companions awoke on the morning of January 6th to meet Elliot Bishai's mother and a church group at the Ellipse, primarily to hear the president speak for the last time. After the speech concluded, they followed the larger group to the Capitol building grounds.

At some point, Grayson Sherrill was separated from the group. Knowing they had a long drive ahead of them, the two younger boys began to look for Grayson Sherrill – they had driven together and they were Grayson's ride back to South Carolina. Their phones had no service and they couldn't text or call him.

By this time, they could see hordes of individuals entering the Capitol and they guessed, correctly that Grayson would be inside.

At approximately 2:26 pm on January 6, 2020, Elias Irizarry climbed through a broken window. They entered a non-private conference room, took photos, and

7

left when told.  At some point, they passed an individual handing out pieces of a bike rack.  Without thinking, Elias took the object and carried it while he was in the building.  He left after 27 minutes.

This is not to say that Elias did not have a heightened level of curiosity and even excitement when they entered the restricted building.  Elias is guilty, knows he is guilty and makes no excuses. He does not blame Grayson for his crime – it was his choice to climb through a broken window. But it is also true that the thought-process of going inside the building was initiated by their search for Grayson Sherrill.

On the ride home, Grayson shared his perspective on the day and what he did at the Capitol.  The next day, Elias called his friend Elliot Bishai in disbelief of what they had been part of. They also decided that they would no longer be social media "friends" with Grayson while justifying to themselves that they were not part of those violent insurrectionists on television.  Notably, Elias did not send a single braggadocios text, or share a triumphant video.  By the time he returned home that night, he already felt ashamed and woke up his ill mother to show her what had happened.

Elias' spontaneous decision to enter Capitol grounds was criminal but it is important to note that he had no plans to go inside the Capitol or even to the Capitol prior to the time he did.  He went to the Capitol because he thought it was a continuation of the rally – Donald Trump had said it would be.  And his brief time in the Capitol was without any incident. He now seeks forgiveness from the nation

through this Court, having learned a valuable lesson.  He now understands having taken responsibility not only for his own actions but understanding how he contributed to death and destruction and a greater harm to this country.  Exh. 1 at 2 ("[I]n some way I participated in that by my very attendance, I had helped the crazy insurrectionists (who I didn't know about then) almost accomplish their goals.").  He also understands that he was played for a fool, declaring "I will never allow myself to be a pawn for misinformation again."  Exhibit A at 2.

## ARGUMENT

### I.   Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).  Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

## II.  Imposing a Sentence of Probation is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

Without a doubt, January 6th left a stain on the Republic.  Elias recognizes this and is appropriately ashamed by his presence inside the Capitol that day.  But in the end, Elias was a month past his nineteenth birthday and committed a trespassing offense and should be sentenced as such.  The government points out that amongst trespassing offenses, it is among the most serious, but this is true of all of the nearly 900 defendants charged in these cases.  Elias' conduct fits the offense of a petty misdemeanor.  His criminal history fits a person who should benefit from a favorable plea offer.  His otherwise consistent drive towards becoming a model citizen fits a person who would respond to the privilege of probation.  And while we have heard many times that the investigation into this case is unprecedented, the same sentencing factors that apply in any other trespassing case apply here.  Elias accepted responsibility for his actions and has shown singular and exceptional remorse.   True, he had already dedicated his life to public and military service but he no longer has that option.  And instead of feeling sorry for himself, he has redoubled his efforts to serve the community.  He has spent two years reflecting upon what he did and what he was a part of.  It has brought him tremendous shame but he has tapped into that emotion and found motivation to become an exceptional citizen and human being.

Elias has been entirely compliant on pretrial release and has done everything that has been asked of him.  Mr. Irizarry should be sentenced as a misdemeanant

who has no criminal record, an impressive track record both academically and personally who has taken responsibility for his actions.  Counsel also asks the Court to consider that he has endured significant punishment for his 27 minutes inside the Capitol.  He has likely lost his lifelong dream to graduate from the Citadel and his ultimate goal to serve in the Armed Forces – goals that he has worked towards for all of his sentient life.  As a result, the Court should sentence him to a period of probation.

In fact, in applying the rubric cited by the U.S. Attorney's Office, it is clear that Elias is at the low end of the spectrum for any of the prosecuted offenses.  In each of its Sentencing Memoranda, the government has forcefully argued:

> Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

See ECF 70 at 17.

Applying these factors demonstrates that Elias should receive a probationary sentence.  He entered the Capitol building well after it had been breached and was not present for the breach; he did not encourage violence or property destruction

and was not in the near vicinity of property destruction; he in fact did not even raise his voice or yell, except to scold individuals who were engaging with the police; he did not make any statements on social media that encouraged or justified January 6th; he did not destroy evidence; he was inside the building for less than thirty minutes; he was cooperative with law enforcement; and he is extremely remorseful for his conduct.

### a. Elias Irizarry's Personal History and Characteristics

Elias Irizarry's history and characteristics are exceptional for a criminal defendant and for any man of his age. Until this incident, he was a young man who was extraordinarily well-behaved, who excelled in school, who was a teacher's pet who spent his free time volunteering. Since this incident, he was somehow able to redirect his stress and anxiety back into his studies and his volunteer work. But while his young adult years tell the story of an exceptional young man, to know Elias requires understanding of the struggles that checkered his youth.

Lorraine Irizarry is extremely engaged with Elias' life and she is a protective and loving mother. Elias recognizes that he is fortunate to have her, even though his father left them while he was a young boy. He does not feel sorry for himself even though there were stretches of his childhood where he went without a home. He does not feel bitter towards either parent even though he lacked a consistent male role model. And Ms. Irizarry's recurring health issues (rheumatoid arthritis) have only made him feel like the protector in the family.

His father's absence, his mother's struggles, the family's reliance on others –
they had a significant impact on young Elias.  He resolved to be the best of good
boys – it broke his heart to see what his mother was going through both physically
and emotionally, and he wanted nothing more than to ease her pain.  But beyond
that, he was lost and was lunging at pillars of identity.  Whether it be his Mexican
heritage, his introduction to politics, he entered his formative years as a boy from
New Jersey with no fixed address to a teenager in South Carolina.

In many ways, all of this was a blessing.  Elias resolved to become someone
important in life.  But he did not have the connections or privilege of someone who
was from the class of future world leaders so he resolved to accomplish his goals by
working hard and doing good. That meant he would never get in trouble and he
would never use drugs.  It meant that he would make measured decisions, talk to
people about his choices.  He found direction as he aged when he found a role model
in Andrew Harris, a half-brother whom he did not know about until he was seven.
Andrew was in the military and Elias wanted to be like him.  Also influenced by
those around him in South Carolina, Elias decided that the best way to accomplish
his goals and serve the community in the process was going the military route.  He
decided that he would work as hard as he could to go to the Citadel – a military
school in South Carolina.

Elias' achievements in his juvenile years eclipse those of many middle aged
adults.  His mind on his mission, he enrolled in and completed the NC Wing Drill
and Ceremonies Academy; became a Cadet Sergeant Major and eventually Cadet

First Lieutenant in the Marine Corps Junior ROTC; he joined the Civil Air Patrol and earned multiple achievement awards; joined the Model United Nations, earning accolades; earned attendance to Palmetto Boys State; and earned scholarships to go to college. When he was accepted into the Citadel, it was the happiest day of Elias and his mother's life. He continued on the track to success, earning academic awards, was inducted into the Political Science Honor Society, became a drill master and becoming admired and respected by fellow students and appreciated and well-liked by faculty. And he accomplished this all before his 19th birthday.

In the meantime, he was a dedicated community servant. Citadel issued him the Pandemic Service Ribbon. From 2020 to 2023, he volunteered at a Veterans Hospital, tutored at the local elementary school and worked on overnight hurricane relief efforts. And though some of this was after his arrest in this case, this was nothing new. Before his arrest, he worked with underprivileged people in the Charlotte area and worked to assist veterans and first responders.

Those around Elias worry that all of this is gone – because of a spontaneous but misguided choice on January 6th, Elias has thrown all of this away. But whether or not his military career is gone, he has demonstrated that he can continue to serve. Whether or not his college career at the Citadel is gone, he has shown that he can continue to develop himself.

But what he has lost, and what he now craves more than ever is to be able to respect himself again. He has done harm to his family name and to the United States – after living a life, albeit short, dedicated to honoring both. He is

14

determined to redeem himself and to help redeem the country in the eyes of the world.

> **b.** Elias' Age at the Time of the Offense

It is true that Elias shows maturity beyond his years and that he has so since he was a child. But Elias' ability to make good choices when having the time and opportunity to think things through is much different than the circumstances he faced on January 6th.

It has often been said that youthful offenders are immature and do not foresee the consequences of their actions. This fact has become recognized as a biological problem, by recent studies and by the Supreme Court. This fact seems to be self-evident in Elias' case in a crime that was reactionary and not premeditated, and in a crime that he regretted almost instantaneously.

Elias' age – just past nineteen at the time of the offense - should strongly be considered when discussing his culpability. Culpability also has been explained as "the degree to which a defendant can be held accountable for his or her actions." Elizabeth Cauffman, Jennifer Woolard, N. Dickon Reppucci, "Justice for Juveniles: Perspectives on Adolescents' Competence and Culpability," 18 QLR 403, 415-416 (1999).

> In this context, immature judgment is considered as a possible mitigating circumstance which would render the defendant less blameworthy for transgressions committed. . . . [Y]ouths' offenses may stem in part from deficiencies in psychosocial factors that adversely affect judgment. If this is the case, then the presumptions of autonomy, free will and rational choice on which adult criminal responsibility is based become weaker. Under

> such circumstances, the criminal actions of juveniles are
> less blameworthy than similar acts committed by adults.
> If this is so, then youths should be subject to less severe
> punishment . . .A legal response that holds youthful
> offenders accountable, while recognizing that they are
> less culpable than their adult counterparts, would
> provide criminal punishment without violating the
> underlying principle of proportionality, which suggests
> that punishment should be based, in part, on the
> blameworthiness of the offender.

*Id.*

In *Roper v. Simmons*, 543 U.S. 551 (2005), and in numerous cases since then, the Supreme Court recognized that " . . our society views juveniles, . . ., as categorically less culpable than the average criminal," (citing Atkins v. Virginia, 536 U.S. 304, 316.(2002)) ("The differences between juvenile and adult offenders are too marked and well understood . . .").

In *Roper* the Supreme Court acknowledged three reasons that the sentence of a juvenile should be less severe than that which an adult offender guilty of the same conduct might warrant:

> Three general differences between juveniles under 18 and adults
> demonstrate that juvenile offenders cannot with reliability be
> classified among the worst offenders.  First, as any parent knows
> and as the scientific and sociological studies . . . tend to confirm, . .
> . [a] lack of maturity and an underdeveloped sense of responsibility
> are found in youth more often than in adults and are more
> understandable among the young. These qualities often result in
> impetuous and ill-considered actions and decisions. . . . Johnson[v.
> Texas, 509 U.S. 350,]367 [(1993)]; see also Eddings [v. Oklahoma,
> 455 U.S. 104], 115-116 [( 1982)] ("Even the normal 16-year-old
> customarily lacks the maturity of an adult"). It has been noted that
> "adolescents are overrepresented statistically in virtually every
> category of reckless behavior." Arnett, Reckless Behavior in
> Adolescence: A Developmental Perspective, 12 Developmental
> Review 339 (1992). In recognition of the comparative immaturity

16

and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent.

The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. Eddings, supra, at 115 ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage").  This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. See Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) (hereinafter Steinberg & Scott) ("[A]s legal minors, lack the freedom that adults have to extricate themselves from a criminogenic setting").

The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. See generally E. Erikson, Identity: Youth and Crisis (1968).

These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult". Thompson [v. Oklahoma, 487 U.S. 815,] 835 [(1988)] (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See Stanford [v. Kentucky 492 U.S. 361], 395 [(1989)] (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate

in younger years can subside." Johnson, supra, at 368; see also
Steinberg & Scott 1014 ("For most teens, [risky or antisocial]
behaviors are fleeting; they cease with maturity as individual
identity becomes settled. Only a relatively small proportion of
adolescents who experiment in risky or illegal activities develop
entrenched patterns of problem behavior that persist into
adulthood").

*Roper,* 543 U.S. at 553-554 (emphasis added).

      The Supreme Court's decision underscores what has long been known in the
psychological community:

> Because the criminal law presumes free-willed moral actors
> -- those who morally can be blamed for wrong-doing  --  it
> deems less culpable those whose capacity to make rational
> choices or whose ability to exercise self-control is
> significantly constrained by external circumstances or
> individual impairments.  Youthfulness affects the actor's
> abilities to reason instrumentally and freely choose
> behavior, and locates an offender closer to the diminished
> responsibility end of the continuum than to the fully
> autonomous free-willed actor.

Barry C. Feld, "Competence, Culpability and Punishment: Implications of Atkins for
Executing and Sentencing Adolescents," 32 Hofstra L. Rev. at 500-501  (citations
omitted).

> Criminal responsibility and moral blameworthiness hinge on
> cognitive and volitional competence. In a framework of
> deserved punishment, it is unjust to impose the same penalty
> on offenders who do not possess comparable culpability.
> Younger offenders are not as blameworthy as adults because
> they have not yet fully internalized moral norms, developed
> sufficient empathic identification with others, acquired
> adequate moral comprehension, or had sufficient opportunity
> to learn to control their actions.  In short, they possess neither
> the rationality--cognitive capacity--nor the self-control--
> volitional capacity--to justify equating their criminal
> responsibility with that of adults.

*Id.* at 502 (citations omitted).

Since *Roper*, medical professionals and courts have noted that the distinction between juveniles and adults is false. As stated by the National Institute of Health: "The brain finishes developing and maturing in the mid to late 20's. The part of the brain behind the forehead, called the prefrontal cortex, is one of the last parts to mature. This area is responsible for skills like planning, prioritizing, and making good decisions." NIH Fact Sheet: The Teen Brain: 7 Things to Know

https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know#:~:text=The%20brain%20finishes%20developing%20and,prioritizing%2C%20and%20making%20good%20decisions.

Dr. Ruben Gur, a professor of psychiatry at the University of Pennsylvania and director of the Brain Behavior Laboratory in the School of Medicine at the University of Pennsylvania thus stated:

> . . .The cortical regions that are the last to mature, particularly those in prefrontal areas, are involved in behavioral facets germane to many aspects of criminal culpability. Perhaps most relevant is the involvement of these brain regions in the control of aggression and other impulses, the process of planning for long-range goals, organization of sequential behavior, the process of abstraction and mental flexibility, and aspects of memory including 'working memory.' If the neural substrates of these behaviors have not reached maturity before adulthood, it is unreasonable to expect the behaviors themselves to reflect mature thought processes.
>
> *****
>
> . . [S]ince brain development in the relevant areas goes in phases that vary in rate and is usually not complete before the early to mid-20's, there is no way to state with any scientific reliability that an individual 17-year-old has a fully matured brain (and should be eligible for the most severe punishment),

> no matter how many otherwise accurate tests and measures
> might be applied to him . . .

Gur, Ruben C., "Brain Maturation and the Execution of Juveniles: Some reflections on science and the law," The Pennsylvania Gazette (January/February 2005) at 15.

Elias' actions compare favorably against those who were around him.  In the spectrum of all defendants, even without considering age, he was particularly orderly, not at all destructive or violent and did not engage in the "crazy" behavior of insurrections around him.  His age, although beyond adolescence, still reflects a physiological disadvantage as compared to nearly all other defendants from January 6th.  As neuroscientist Sandra Aamodt has said, "The car rental companies got to it first, but neuroscientists have caught up and brain scans show clearly that the brain is not full finished developing until about age 25…. 18 year olds are about halfway through that process.  Their prefrontal cortex is not fully developed.  That's the part of the rain that helps you to inhibit impulses and to plan and organize your behavior to reach a goal."  *Brain Maturity Extends Well Beyond Teen Years¸* https://www.npr.org/templates/story/story.php?storyId=141164708#.  Thus, any comparisons upon which the government relies should be of similarly situated defendants for an apt comparison.

### c.  Nature and Circumstances of the Offense

Although Elias has taken responsibility for illegally entering the Capitol building, there are a number of reasons why this factor weighs in favor of a sentence short of incarceration.  Elias had no plans to go to the Capitol.  And he did not engage in any violence or destruction that day.  He did not dress prepared for violence.  He did not confront any police officers.  He did not go into any restricted

areas.  He did not encourage anyone to do anything. He did not steal anything.  He did not do anything to disrespect the Capitol or the institution, such as drink alcohol or ingest drugs.  He looked for his acquaintance, took some photographs, walked with him and left.  He did not even yell or chant.

> ### d.  The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on Elias' personal history and characteristics, it is clear that his conduct on January 6, 2021 was an isolated event, was completely out his character and will never happen again.  It is also extremely unlikely that he will recidivate in any manner given his lack of criminal history and his perfect record on pre-trial supervision for the past two years.  Any potential for recidivism can be addressed by the probationary sentence recommended by the defense and community service.

The government recommends a severe sentence of incarceration.  The government's proposal incorporates no leniency for Elias despite his acceptance of responsibility, his contrition, his difficult life circumstances, the consequences he has already faced for his actions, and his youth that gives significant context to his actions on January 6th.

When weighed against other cases, Elias' conduct is more suitable for a sentence that spares him incarceration.   The government's recommendation has no support when analyzing past sentences and its imposition would result in a drastic disparity in sentencing.

The government requests a sentence of incarceration as a condition of 36 months of probation.  Elias welcomes a period of probation and the record shows that he will be highly successful.  However, the request for incarceration is unduly harsh and does not fit Elias' circumstances.

The vast majority of individuals who have pleaded guilty to the misdemeanor offenses like Elias has been spared incarceration.  There have been some outlier sentences for individuals who stole things from the Capitol or appeared to seek out offices belonging to those in Congressional leadership but, in an effort to avoid disparate sentences, judges in this District have followed the cues presented by the misdemeanor charges.

A number of defendants charged under 1752(a), the one year misdemeanor, have received sentences of straight probation.   Rachel Pert was sentenced to probation despite admitting that she was trying to "storm them to stop the vote." *United States v. Rachel Pert¸*21-cr-139 (TNM). Jeffrey Witcher was sentenced to probation despite "penetrat[ing] the Crypt portion of the U.S. Capitol, where violence between rioters and law enforcement was occurring around him" and deleting evidence from his phone, *United States v. Jeffrey Witcher¸*21-cr-235 (RC), ECF 39 at 2.  Kevin Cordon received probation despite entering the Capitol wearing body armor and a gas mask, *United States v. Kevin Cordon*, 21-cr-277 (TNM). Verden Nalley received probation despite spending 30 to 40 minutes in the Capitol and threatening to "be back with guns in two weeks", *United States v. Verden Nalleyi,* 21-cr-116 (DLF) ECF 93 at 2.  Jenny Cudd received probation despite

wearing bulletproof sweatshirt, pushed against police yelling "go" and "charge," *United States v. Jenny Cudd*, 21-cr-68 (TNM) ECF 90 at 2.

A probationary sentence is appropriate for Elias because of his youth and his background. And unlike some of the other younger individuals charged of these offenses, Elias did not "physically [fight] his way in" and then brag about doing so while raising tens of thousands of dollars like Bruno Cua.

https://www.fox5atlanta.com/news/milton-teen-charged-in-capitol-breach-raises-more-than-20000-for-legal-fees. He did not rifle through papers on the desks of senators and chant "TREASON!" like Christopher Carnell. In fact, no aggravating circumstances apply here. Elias was not in the District to stop the certification, he did not assault anyone, he did not encourage violence or property destruction, he was not part of the initial breach, he stayed in the building for minimal time, he engaged with the officers in a friendly manner, he did not destroy evidence and he did not go to a sensitive area when he was inside a building. He has been entirely compliant on pretrial release.

Instead, Elias has spent the past two years as he should. Worried and concerned about what he did and how can make it right. Although his actions speak more to his character than words, the words of those who have known him speak volumes. As his half-brother Andrew Harris attests: "He is a young man, who despite his flaws, aims to be better than he was the day before. A young man who even in his worst of times, has sought to comfort and serve others. A young man who will undoubtedly make mistakes again but is more than wise enough to

knowledge them as his own mistakes, take responsibility for them – to include the consequences – and learn from them for the betterment of himself, his team and his country." Exh. 2 at 2.  He is sincerely remorseful.

Incarceration is not necessary to adequately punish him.

## <u>CONCLUSION</u>

For the reasons stated above, Elias Irizarry respectfully requests that the Court impose a period of probation and complete a period of community service. Mr. Irizarry also requests that a fine not be imposed in light of his lack of income. He has already attempted to pay $500 restitution and intends to do so immediately after sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Eugene_ohm@fd.org