**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00282-3 (TSC)** |
| **v.** | : | |
| | : | |
| **ELIAS IRIZARRY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Elias Irizarry to 45 days' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution.

### I.    Introduction

The defendant, Elias Irizarry, a former student at the Citadel, the Military College of South Carolina, drove with his two friends and co-defendants, Grayson Sherrill and Elliot Bishai, from South Carolina to Washington, D.C. to attend the "Stop the Steal" rally. Afterwards, they participated in the attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] The approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On October 26, 2022, Irizarry pled guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. As explained herein, a sentence of 45 days' imprisonment, with supervised release to follow, is appropriate in this case because: (1) before entering the building, Irizarry directed and encouraged rioters toward the Capitol building; (2) before entering the building, Irizarry observed broken bicycle racks and fencing from the restricted perimeter, saw and smelled tear gas, saw rioters violently attack officers on the West front, and saw lines of police trying to block the crowd from progressing but continued towards the Capitol; (3) Irizarry entered the building through a shattered window at the Senate Wing Door; (4) Irizarry armed himself with a metal pole that he carried throughout the Capitol grounds and building; (5) Irizarry entered and remained in a sensitive area in the Capitol building, namely a United States Senate conference room, Room S145; (6) on January 6, Irizarry was a member of the United States Civilian Air Patrol, a federally-supported public entity devoted to public safety[2], and thus betrayed his duty to "keep the homeland safe"; (7) Irizarry disobeyed an oath he took as a student at The Citadel to "abide by the college's core values of honor, duty and respect as future members of the South Carolina Corps of Cadets[3]"; and (8) even after exiting the Capitol, Irizarry remained on Capitol grounds until past dusk.

The Court must also consider that Irizarry's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers where were trying to prevent a breach of the Capitol Building and

---

[2]  *See* https://www.gocivilairpatrol.com/about/civil-air-patrols-three-primary-missions (visited February 24, 2023).

[3]  *See* https://today.citadel.edu/preparing-to-welcome-the-class-of-2026/ (visited February 24, 2023). Although students at The Citadel are not required to serve in the military, about one-third of each class earn commissions to become officers in the U.S. military. *See* https://go.citadel.edu/about-the-citadel/.

2

disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Irizarry's participation in a riot that actually succeeded in halting the Congressional certification combined with his witnessing of violence against law enforcement, entry into a sensitive area, carrying a pole throughout the Capitol, and encouragement of other rioters renders a jail sentence both necessary and appropriate in this case.  The facts and circumstances of Irizzary's crime support a sentence of 45 days of incarceration followed by 12 months of supervised release in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 96 (Statement of Offense) at 1-3.

### *Elias Irizarry's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Elias Irizarry travelled by car with co-defendants Elliot Bishai and Grayson Sherrill from South Carolina to Northern Virginia to attend the "Stop the Steal" rally.  At the time, Irizarry was a cadet in a Civil Air Patrol unit and a student at The Citadel, a military college in South Carolina.[4]

---

[4] The Civil Air Patrol "is a congressionally chartered, federally supported non-profit corporation that serves as the official civilian auxiliary of the United States Air Force." https://www.google.com/search?q=civil+air+patrol. According to its website

> Civil Air Patrol is America's premier public service organization for carrying out emergency services and disaster relief missions nationwide. As the auxiliary of the U.S. Air Force, CAP's vigilant citizen volunteers are there to search for and find the lost, provide comfort in times of disaster, and work to keep the homeland safe.

https://www.gocivilairpatrol.com/about/civil-air-patrols-three-primary-missions (visited February 24, 2023).

After attending the former president's rally but before the end of his speech, Irizarry, Bishai, and Sherrill marched towards the West side of the Capitol. As they approached the building, they saw downed bicycle barricades and broken fencing from the restricted perimeter. According to Irizarry, another rioter handed Irizarry and Sherrill metal poles that had been broken from a bike barricade. Irizarry carried this metal pole with him for the remainder of his time on Capitol grounds and in the Capitol building.

While on the West front, a group of police officers from a Civil Disturbance Unit attempted to make their way through the crowd of rioters in an effort to reach the Capitol Building and reinforce the police line.  Irizarry and Sherrill remained in the crowd of rioters who circled and physically assaulted many of the officers, preventing the officers from moving forward. In fact, Irizarry's co-defendant, Sherrill, swung his metal pole and struck an officer. *See* Exhibit 1. In addition to witnessing violence against officers while on the West front, Irizarry saw and smelled tear gas, heard flash bangs, and observed lines of police trying to block rioters from approaching and entering the building.

Irizarry, Bishai, and Sherrill eventually progressed toward the building. Irizarry and Sherrill continued to wield their metal poles as they joined the growing crowd that was actively trying to overcome a thin line of officers trying to protect the building.



*Figure 1: Screenshot of open-source footage showing Irizarry (red circle)
thrusting his metal pole in the air as rioters chanted "USA!"
and confronted police officers at the front of the line*

Eventually, Irizarry climbed through scaffolding and ascended stairs to the Upper West

Terrace. From there, as shown in the screenshots below, Irizarry watched as rioters scaled walls

and climbed the scaffolding near the Northwest stairs.



*Figures 2 & 3: Screenshots from open source footage showing Irizarry (red arrow)
watching as rioters scaled the Upper West Terrace wall to reach the Capitol building*

Irizarry's co-defendant, Elliot Bishai, documented this and other events in videos later

seized from Bishai's phone. In one such video, Bishai can be heard yelling, "LET'S GO, CIVIL

WAR TWO!" while Irizarry used his hand and the metal pole to motion rioters towards the stairs

as a means of directing rioters how to more easily access the building.  *See* Exhibit 2.  At the same time, an individual – likely Irizarry based on a comparison of the voice with Irizarry's known voice from other video footage – can be heard directing rioters to "GO UP THE SIDE! GO UP THE SIDE!" in reference to the Northwest stairs.



*Figure 4: Screenshot of Bishai's video footage (Exhibit 2) showing Irizarry's hand waving a metal pole with a voice yelling* "GO UP THE SIDE!"

After this video was recorded, but before entering the Capitol Building, Irizarry and Bishai separated from Sherrill.

At approximately 2:26 p.m., only thirteen minutes after the initial breach of the Capitol building at the Senate Wing Door, Irizarry and Bishai entered the building through a shattered window to the left of the Senate Wing Door. *See* Exhibits 3 and 4.



*Figure 5: Screenshot of open source footage (Exhibit 3) showing Irizarry (red circle) about to enter the Capitol building through a broken window, metal pole in hand*



*Figure 6: Screenshot of Capitol Police surveillance footage (Exhibit 4) showing Irizarry (red circle) entering the Capitol building through a broken window, metal pole in hand*

As he jumped through the window, Irizarry stepped over shattered glass from the recently smashed-in window. Rioters chanted "TAKE IT BACK!" *See* Exhibit 5. To Irizarry's left, a line of USCP officers blocked rioters from progressing toward the direction of the Senate floor. One rioter yelled at them, "YOU'RE OUTNUMBERED!" *See* Exhibit 3.

Irizarry and Bishai turned right and walked down a hallway. They stopped shortly thereafter and entered a private conference room – Senate Room S145. Irizarry and Bishai

remained there long enough for Irizarry to sit comfortably in chairs in the conference room and for

Bishai to film a video with his phone.  *See* Exhibit 6.



*Figure 7: Open source photo showing Irizarry (red circle) holding the metal pole across his lap and gesturing with his left hand while sitting in a chair in S145*

After leaving the private room, Irizarry and Bishai proceeded to the Crypt where they

excitedly took photos and videos of one another. From there, Irizarry – still armed with a metal

pole – and Bishai joined other rioters and took an elevator to the fourth floor.  When they exited

the elevator, they entered a hallway with Congressional Committee offices.



*Figures 8 & 9: Screenshots of open source footage showing Irizarry (red circle/arrow) exiting the elevator at the fourth floor, metal pole in hand, and approaching a hallway with Congressional committee offices*

Irizarry and Bishai eventually made their way to the Rotunda where they rejoined Sherrill.

Both Sherrill and Irizarry still carried metal poles as they roamed around the Rotunda.



*Figure 10: Screenshot of open source footage showing Irizarry (red circle) marching through the Rotunda metal pole in hand next to Sherrill (yellow circle)*

In the Rotunda, Irizarry, Bishai and Sherrill took photographs of one another climbing on statues. *See* Exhibit 8.



*Figure 11: Screenshot of Capitol surveillance footage showing Irizarry (red circle) standing on a statue posing for a picture (Exhibit 8)*

They left the Rotunda and continued to roam through chaos and smoke-filled halls.

Eventually, at about 2:47 p.m., Irizarry exited the building after spending 27 minutes inside. For more than an hour and a half, Irizarry remained outside the building, joining chants on the East steps where officers attempted to gain control of the area, marching through the East plaza, and sitting on government vehicles parked outside the Capitol.



*Figures 12 & 13: Irizarry (red circle) remaining on the Capitol steps, top, and sitting on a government car with his metal pole across his lap, bottom*

Irizarry did not leave the Capitol grounds until after dusk.



*Figure 14: Irizarry (red arrow) and co-defendants
leaving Capitol grounds in the evening*

*Elias Irizarry's Interview*

On November 1, 2022, pursuant to his plea agreement, Irizarry was interviewed by the

Federal Bureau of Investigation, and admitted to the conduct described above.

*The Charges and Plea Agreement*

On March 15, 2021, Elias Irizarry and Elliot Bishai were charged by complaint with

violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 9.

Sherrill had previously been charged via complaint on February 23, 2021.  ECF No. 1.  On March

16, 2021, Irizarry was arrested in South Carolina.  On December 15, 2021, Sherrill was charged

via indictment with felonies, including 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 111(a)(1). ECF No.

57.  Irizarry and Bishai were included on that indictment and charged with the same misdemeanors

charged in the complaint.  *Id*.

On October 26, 2022, Irizarry pleaded guilty to Count Seven of the Indictment, charging

him with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or

Grounds. ECF Nos. 71 and 72. By plea agreement, Irizarry agreed to pay $500 in restitution to the Architect of the Capitol. *Id*.

### III.     Statutory Penalties

Irizarry now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Irizarry faces up to one year of imprisonment, supervised release of up to one year, and a fine of up to $100,000. Irizarry must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. PSR at ¶¶ 38-45. According to the PSR, the U.S. Probation Office calculated Irizarry's adjusted offense level under the Sentencing Guidelines as follows:

| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Restricted Area | 2 |
|  | Total | 6 |
|  |  |  |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -2 |

**Total Adjusted Offense Level        4**

*See* PSR at ¶¶ 38-45.

The Probation Office calculated Irizarry's criminal history as a category I, which is not disputed. PSR at ¶ 48. Accordingly, the Probation Office calculated Irizarry's Guidelines imprisonment range at 0-6 months. PSR at ¶ 82. Irizarry's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness.

## V.        Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors that a court must consider in formulating the sentence and, as described below, weighs in favor of 45 days of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273,

1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).

While assessing Irizarry's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Irizarry, the absence of violent or destructive acts is not a mitigating factor. Had Irizarry personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Irizarry is therefore does not meaningfully distinguish him from most other misdemeanor defendants.

Irizarry joined the mob for many hours. After he armed himself with a metal pole, Irizarry watched as rioters violently assaulted officers who were trying to make their way through the crowd. He then climbed scaffolding to reach the upper West terrace and encouraged and directed rioters by excitedly waving rioters up the stairs to gain access to the building. After he reached the Senate Wing Doors, Irizarry eagerly climbed through a shattered window and roamed deeper into the building, despite seeing officers fiercely guarding the hallway leading to the Senate floor. While brazenly wielding his metal pole, Irizarry made it into numerous areas, including up an elevator to private rooms and inside of an office, despite smoke-filled halls, sirens blaring, and utter chaos. Despite his military training, none of this dissuaded him, and in fact he can be seen excitedly smiling as he sits in a private meeting area for Senators, staking his claim to the area by sitting in a chair with his metal pole across his lap. After he entered the Rotunda, Irizarry demonstrated the upmost disrespect when he climbed onto a statue to pose for a photo. Then, even

after he exited the building, Irizarry remained a menace for police officers as he stayed on the East stairs, roamed the East plaza, and climbed on government vehicles for more than one and a half hours. He did not leave the Capitol grounds until police officers had finally gained control of the area and were able to corral rioters off the grounds.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days of incarceration in this matter.

### B.  Irizarry's History and Characteristics

While Irizarry does not have a criminal history, PSR ¶¶ 46-52, what is most concerning about his history and characteristics is that, at the time of his offense, Irizarry was a cadet in a Civil Air Patrol unit – a civilian auxiliary of the United States Air – and a student at The Citadel, a college that trains individuals for military service.  While Irizarry's service in the Civil Air Patrol unit, and military training at The Citadel would ordinarily be laudable, it renders his conduct on January 6 all the more troubling.  Because of his training, Irizarry was undoubtedly aware of the safety threat posed by a mass of angry rioters to the Congressional members and staff inside the building. He was undoubtedly aware of the danger to the massively outnumbered police who were trying to protect the building and uphold the law. And, as a student at The Citadel, he took an oath that he violated on January 6, 2021. In this case, Irizarry's former service in the Civil Air Patrol, and his military training, make his conduct on January 6 all the more egregious and demonstrate a need for specific deterrence in the form of incarceration.

Finally, the FBI reviewed Irizarry's cell phone pursuant to a search warrant. There was a gap of data between January 1, 2021 and January 8, 2021, which suggests that Irizarry deleted information from his cell phone pertaining to his involvement on January 6, 2021.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you

send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence:* After Irizarry was arrested, he did not show remorse but rather was determined to figure out who "backstabbed" him by "turning him in" to authorities. Irizarry discussed via text message how the FBI found out that he went inside the Capitol and who turned him in. Between late January and early March 2021, Irizarry also exchanged text messages with co-defendant Bishai about joining the Russian Military if they were not permitted to remain in the U.S. Military due to the "FBI Stuff." After January 6, Irizarry and Bishai also participated in a group chat titled "Civil War" and discussed using small planes to cross borders undetected. Irizarry's concerns after January 6, which ring a far cry from remorse, highlight the need for specific deterrence.

Additionally, Irizarry's conduct on January 6 similarly underscores the need for specific deterrence. Irizarry's training at The Citadel and in the Civil Air Patrol would have provided him with a clear understanding of how dangerous his and the other rioters' actions were on January 6, yet he chose to participate anyway.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  This Court must sentence Irizarry based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Here, the Court is presented with a rioter-defendant who witnessed signs of violence outside the Capitol building, encouraged other rioters to get closer to the building, entered the building through a broken window, carried a metal pole with him throughout the Capitol, entered a sensitive space, and did all of this despite his military training. While no one factor is dispositive, comparable cases demand a sentence of incarceration.

Other judges of this court, and this Court, have sentenced Capitol breach defendants who spent time in sensitive places within the Capitol to terms of incarceration. A defendant's entry into a sensitive space places that defendant in a more serious category of offenders than defendants who remained in public hallways or rooms such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. Indeed, an unauthorized individual in a private space poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-

cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation and an attempted display of power, above and beyond entering the building. While Room S145 that Irizarry entered was not a private office, it is clearly recognizable as a more private space than, for instance, the Rotunda, and thus implicates similar concerns.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), before this Court, the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) in connection with spending time inside the Spouse's Lounge of the Capitol. This Court sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing.  Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Mazzocco took photographs of himself smirking during the riot and posted them to social media. By contrast, Irizarry did not post photographs to social media, but unlike Mazzocco, did nothing to mitigate the rioters' actions, and, in fact, tried to assist the rioters in taking the fastest route to get to an entrance to the building. Irizarry also armed himself with a metal pole.

This Court sentenced Irizarry's co-defendant to 14 days of incarceration. *United States v. Elliot Bishai*, 21-cr-282. Although Irizarry and Bishai remained together outside and inside the Capitol building, a longer sentence is warranted for Irizarry.  Irizarry menacingly carried a metal pole throughout the Capitol grounds and building.  He used the metal pole to wave rioters toward the Capitol building and wielded the pole as he occupied rooms inside the Capitol where rioters violently assaulted officers (such as the Crypt and Rotunda). Irizarry's actions demonstrate a certain brazenness and intentionality that requires consideration in his sentence. By wielding a

metal pole throughout the building, he caused a very dangerous and fearful threat to the police officers who tried to protect the building and those inside it.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, the government recommends that this Court sentence Elias Irizarry to 45 days' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Ashley Akers*
        ASHLEY AKERS
        Trial Attorney
        MO Bar No. 69601
        U.S. Attorney's Office (Detailee)
        601 D Street, N.W.
        Washington, D.C.
        202-353-0521
        Ashley.Akers@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

On March 8, 2023, a copy of the foregoing was served on counsel of record for

the defendant via the Court's Electronic Filing System.

<u>/s/ *Ashley Akers*</u>
ASHLEY AKERS
Trial Attorney
Capitol Riot Detailee